UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA        :        07 Cr. 672 (RJH)
                                :
        -against-               :
                                :
CLAUDIA FRANCIS,                :
                                :
                Defendant.      :
--------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT CLAUDIA FRANCIS'S PRETRIAL MOTIONS

This memorandum of law is submitted in support of defendant Claudia Francis's pretrial motions. Specifically, Ms. Francis seeks an Order (1) suppressing all of the evidence seized from her home on June 28, 2007; (2) directing the government to make early discovery of a witness list; an exhibit list; witness statements and impeachment material; and Rule 404(b) evidence, if any; (3) directing the government to provide a bill of particulars, Fed. R. Crim. P. 7(f); and (4) for such other and further relief as the Court may deem just and proper.

Claudia Francis also joins in the pretrial motions made by her co-defendants to the extent such motions are applicable to her.

## FACTS

At about 6:15 in the morning on June 28, 2007, Claudia Francis was awakened by loud pounding on the door of her home located at 137-07 Frankton Street, Rosedale, NY. She lives in the downstairs apartment of that two-family home. Ms. Francis opened the door, and approximately four FBI agents entered the apartment. They said they had a warrant for her arrest. The agents asked if there was anyone else at home, and Ms. Francis said that only her two children were at home. The agents also asked if there were any weapons in the apartment,

and Ms. Francis said there were none. The agents then looked through all the rooms of the apartment. (Claudia Francis aff., ¶ 2).[1]

After inspecting the apartment, the agents told Ms. Francis to get dressed. They asked if she had a passport. She said she did and retrieved it from a small safe in her bedroom. After retrieving the passport, she re-locked the safe and left it on the bed. (Claudia Francis aff., ¶ 3).

Ms. Francis was then handcuffed, taken out of the apartment, and placed into an agent's car. While she waited in the car for about half an hour, the agents remained in the apartment. She was then transported to the FBI's office in White Plains, arriving at about 8:30 a.m. At the FBI office, an agent asked Ms. Francis to consent to a search of her apartment. Ms. Francis declined. Half an hour later, the agent again asked for permission to search, saying it would be easier if Ms. Francis cooperated. Ms. Francis declined a second time. (Claudia Francis aff., ¶¶ 4-5).

The agents remained in the apartment the entire day. Ms. Francis's brother-in-law, Bradford Francis, who lives in the upstairs apartment in the same house, was in and out of his apartment several times that day. Claudia's two children stayed with him or his girlfriend after Claudia was taken away. Bradford noticed that the agents remained in Claudia's apartment all day. At about midday, Bradford rang the doorbell for Claudia's apartment and asked if the kids could come in. The agents said "no." From the doorway, Bradford could see post-it notes stuck on various surfaces. He also saw the agents watching TV and eating pizza. (Bradford Francis aff., ¶¶ 1-4).

---

[1] Affirmations from Claudia Francis, her husband Gary Francis, and her brother-in-law Bradford Francis are attached to the notice of motion.

Claudia's husband, Gary Francis, arrived home at about 5:30 or 6:00 p.m. The agents were still there. Gary asked why and they said they were waiting for a search warrant. The agents allowed Gary to remain in the living room while they waited for the warrant. Agents went into and out of several rooms while Gary waited. It appeared to him that the apartment had already been searched. For example, a side table in the living room had been opened and the contents of the drawer had been removed. Also, his belongings and furniture in the bedroom had been moved. Gary also saw post-it notes stuck to various surfaces, identifying various rooms as "A," "B," "C," etc. (Gary Francis aff., ¶¶ 1-5).

At 6:37 p.m. on June 28 – more than twelve hours after the agents first entered Claudia Francis's home – Magistrate Judge Marilyn D. Go of the Eastern District of New York issued a warrant to search the apartment. (The warrant and warrant application are attached as Exhibit B to the accompanying Briccetti affirmation.) The warrant authorized the seizure of certain property listed on "Attachment A" to the warrant, including several computers and a printer, each of which was identified by a serial number; two safes and the contents thereof; televisions and other specified electronic equipment; and computer hardware, software, computer-related documentation, documents relating to the operation of a computer, and other items all related to the computers. The "Attachment A" to the search warrant made no mention of any gift cards, credit cards, receipts, notebooks, papers, or documents other than documents specifically related to the operation of a computer.

Special Agent Cordel James submitted an affidavit in support of the application for the search warrant. (Briccetti aff., Exh. B). The affidavit states that when the agents arrived at the apartment they "did a sweep of the house and saw in plain [sic] a shredder containing shredded

credit cards and/or gift cards, approximately 50 gift cards, and one Cingular reward debit card" in the living room, a bedroom, the kitchen, and the dining room. (James aff., ¶ 5). Elsewhere, the affidavit states that "[a]lso found <u>upon a search of the house incident to arrest</u>, the agents found were [<u>sic</u>] two safes with model numbers (one safe on the bed in CLAUDIA FRANCIS' room and one in a closet), two computers, flat screen plasma televisions, electronic equipment such as DVD recorders and camcorders located throughout the house." (James aff., ¶ 3) (emphasis added). The affidavit also identifies, by serial number and location in which each item was found, five different desktop and laptop computers, as well as a "scanner printer." (James aff., ¶ 6). To obtain these serial numbers, the agents would have had to move the items, turn them around or upside down, and closely examine them. (Claudia Francis aff., ¶ 7).

The search warrant affidavit also describes Agent James's investigation prior to June 28. According to James, in August 2006 – ten months earlier – a credit card was used to make unauthorized purchases at two Nordstrom stores, and shortly thereafter some of those items were returned for credit to a credit card belonging to Claudia Francis. Also, according to James, in April 2007, a different credit card was used to make an unauthorized purchase at a "retail store." The affidavit states that the goods purchased were returned to the same store in exchange for a gift card which was used to purchase items installed in a car, and the work order for that installation contains Claudia Francis's name and signature. (James aff., ¶ 7).

At about 7:30 p.m., an agent entered the apartment and told the other agents that she had the search warrant. Almost immediately, the agents began moving items out of the apartment. It appeared to Gary Francis that the only items the agents searched after the warrant arrived were the two safes. Gary opened the safes at the agents' request. After the agents had inventoried the

contents of the safes, they provided Gary Francis with handwritten inventories of the items that had been removed from the apartment. Gary signed each page of the inventories. On page "6 of 10," the safes had already been listed as "Sentry 1100 Safe" and "Sentry 1300 Safe." The agents crossed out those two listings in Gary's presence and had Gary initial the changes. It appeared to Gary that the inventories had been prepared prior to when the agents arrived with the search warrant. (The search warrant inventories are attached collectively as Exhibit C to the accompanying Briccetti affirmation.) Within about 45 minutes after the agent arrived with the search warrant, the agents left. (Gary Francis aff., ¶¶ 6-8).

When Claudia Francis arrived home later that evening, her apartment was a mess. The agents had left garbage in the kitchen, including several empty pizza boxes and soda containers. It appeared they had been there all day. (Claudia Francis aff., ¶ 6).

The indictment in this case was filed on or about July 23, 2007. Count One charges Claudia Francis and five others with conspiracy to "effect transactions with access devices issued to other persons" with intent to defraud. 18 U.S.C. § 1029(b)(2). Count One contains no factual particulars whatsoever about the alleged scheme or the "means and methods" of the conspiracy. Count Two charges all six defendants with the corresponding substantive offense. 18 U.S.C. §§ 1029(a)(5), 1029(b)(1). Claudia Francis is not named in Count Three. (The indictment is attached as Exhibit A to the accompanying Briccetti affirmation.)

The government has produced more than 3,000 documents in discovery, as well as numerous surveillance tapes from Nordstrom. The documents consist mainly of bank, credit card, and retail store records, as well as items seized in various searches, including the search of Claudia Francis's home. The government has also produced photographs of some, but not all, of

the various pieces of electronic equipment seized from Ms. Francis's home. The photographs show the serial numbers on these items, which all appear to be on the back or bottom of the equipment. There are no photographs of the computers identified by serial number in paragraph 6 of Agent James's search warrant affidavit.

Finally, in response to a defense request for photographs and/or videotapes taken during the course of search itself, as well as for all records (digital or otherwise) relating to the time at which such photographs and/or videotapes were taken, the government stated that photos were taken during the course of the search, but they were "overexposed" and thus would not be produced. The government simply ignored the request for records relating to the time at which such photos were taken. (The correspondence relevant to this request is attached collectively as Exhibit D to the accompanying Briccetti affirmation.)

## ARGUMENT

## POINT ONE

### THE EVIDENCE SEIZED FROM CLAUDIA FRANCIS'S HOME SHOULD BE SUPPRESSED

The FBI agents in this case conducted a warrantless search of Claudia Francis's home. Such searches "are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). The search warrant later obtained was plainly based on the earlier unlawful warrantless search, and thus the evidence obtained thereby – everything that was seized from Ms. Francis's apartment – was the "fruit of the poisonous tree" and must be suppressed. Wong Sun v. United States, 371 U.S. 471, 484-85 (1963).

An evidentiary hearing is necessary to establish all of the facts relevant to the search.

Some of the relevant facts are set forth in the accompanying affirmations and in the search warrant application. However, the agents had control of Ms. Francis's apartment for more than twelve hours on the day of her arrest, and during most of that time they excluded everyone else. Thus, the agents themselves will need to testify at a hearing and produce any records, photographs, and videotapes relating to the search. The government claims that photographs taken during the course of the search are "overexposed," and refused to produce them. The government also ignored the defense request for records relating to the time such photos were taken. This is unacceptable. The Court should direct the government to produce, well in advance of the suppression hearing, all photos taken during the course of the search – "overexposed" or not – and all records relating to when these photos were taken. Presumably, the photos were taken on a digital camera. Digital photos contain a digital record of the date and time they were taken. Such information will shed light on the key issue of when the search was actually conducted, whether before the search warrant was obtained, or after.

What is known so far is the following: First, the agents were in the apartment for more than twelve hours <u>before</u> they obtained a search warrant. They made themselves at home, leaving behind empty pizza boxes and soda containers. Long before the warrant arrived, they placed post-it notes around the house identifying the areas searched, they emptied drawers, and they moved furniture and other personal belongings around. They tried repeatedly – and unsuccessfully – to convince Claudia Francis to consent to a search of her home.

Moreover, Agent James acknowledged in his search warrant affidavit that the agents had indeed conducted a "search of the house incident to arrest," during which numerous items were observed and identified (including the safe on the bed in Claudia Francis's bedroom). (James

aff., ¶ 3).  However, a lawful search incident to arrest extends only to areas "within which [the arrestee] might gain possession of a weapon or destructible evidence."  Chimel v. California, 395 U.S. 752, 763 (1969); United States v. Blue, 78 F.3d 56, 60-61 (2d Cir. 1996); United States v. Gorski, 852 F.2d 692, 695 (2d Cir. 1988).  Certainly, the agents' search here went beyond such a circumscribed area.

In addition, although the agents were permitted to conduct a protective sweep (or security check), such a sweep is limited to a "quick and limited pass" through the premises to detect the presence of third parties who might pose a danger.  United States v. Escobar, 805 F.2d 68, 71 (2d Cir. 1986); accord, Maryland v. Buie, 494 U.S. 325, 334 (1990); United States v. Kiyuyung, 171 F.3d 78, 83 (2d Cir. 1999).  James claimed that when the agents arrived at the apartment they "did a sweep of the house" and saw a shredder and gift cards in "plain view."  But he also states that they actually recorded the serial numbers off of numerous pieces of electronic equipment, something that had to require moving and closely examining the items.  This was a search, plain and simple.  Arizona v. Hicks, 480 U.S. 321, 324 (1987) (moving stereo equipment to obtain serial number).  The agents may have started with a "sweep" but they moved from there to a full-scale search, long before they obtained the search warrant.

Further confirmation that this was a full-scale search is Agent James's statement that one safe was found on the bed in Claudia Francis's bedroom. (James aff., ¶ 3).  The safe was placed there by Ms. Francis after the agents had entered the apartment, did their "sweep," and told her to get dressed, and after she had retrieved her passport from the safe. (Claudia Francis aff., ¶ 3).  Since the safe was not on the bed when the agents did their initial sweep, it had to have been observed by the agents upon a later search of the house – just as James states in his affidavit.

There are other indications that the agents searched the apartment before they obtained a search warrant, although a hearing is necessary to develop the facts fully. In addition to the post-it notes and the furniture that had been moved and drawers emptied, the agents prepared ten pages of detailed inventories. (Briccetti aff., Exh. C). These inventories not only list the more than 100 items seized, they meticulously record the fifteen or sixteen-digit card numbers from each of the approximately fifty gift cards or credit cards seized, and the multi-digit serial numbers from the approximately twenty different pieces of electronic equipment seized. This had to have taken an enormous amount of time. Yet the agents almost immediately began moving items out of the house after the search warrant arrived and were gone within forty-five minutes of the arrival of the warrant. Moreover, the two safes were already listed in one of the ten pages of inventories before they were opened and searched (page 6 of 10). The agents then crossed out those entries and prepared two additional pages of inventories for the contents of the safes. (Gary Francis aff., ¶¶ 6-8). This too suggests that the initial ten pages of detailed inventories were prepared <u>before</u> the search warrant arrived, because the house had been searched before the warrant was obtained.

It is also noteworthy that "Attachment A" to the warrant, which lists the items to be seized, does not mention the shredder, the shredded credit cards, and the gift cards. Thus, their seizure was illegal, regardless of whether the warrant was otherwise lawful. Although a hearing will be necessary to develop all the facts, the government cannot credibly claim that the shredder, the shredded credit cards, and the approximately fifty gift cards were seized under the "plain view" exception to the warrant requirement. Even if the agents were lawfully in the apartment to arrest Claudia Francis, they were not entitled to seize these items because their

"incriminating character" was not immediately apparent. Minnesota v. Dickerson, 508 U.S. 366, 375 (1993); Horton v. California, 496 U.S. 128, 136 (1990); United States v. Kiyuyung, 171 F.3d at 83. The agents needed a search warrant to seize these items, and they never got one. As to the seizure of these items, the warrant violated the particularity requirement of the Fourth Amendment. See generally Marron v. United States, 275 U.S. 192, 196 (1927).

Finally, the warrant is also defective because it woefully lacks probable cause with respect to the various categories of items delineated in the application affidavit. See United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992); United States v. Travisano, 724 F.2d 341, 346 (2d Cir. 1983). Agent James claimed that based on his investigation there was probable cause to believe the electronic equipment was purchased with credit cards belonging to other people. (James aff., ¶ 8). This is completely unsupported by the facts set forth in the affidavit. There is nothing in the affidavit to the effect that Claudia Francis or anyone else purchased this particular equipment or similar equipment with stolen credit card information. Insofar as it relates to Claudia Francis, the James affidavit mentions "goods" – presumably clothing – purchased at Nordstrom ten months earlier and some unidentified object installed on a car. (James aff., ¶ 7(a), (b)). It certainly does not identify any electronic equipment purchased with stolen credit card information, and it also only talks about items that were returned for credit.

James also claimed probable cause to believe that there were documents and other records relating to the conspiracy at the premises. (James aff., ¶ 9). Based on what? There is absolutely nothing in the warrant affidavit to support this conclusory statement.

James also claimed that the two safes probably contained "fruits of the offense." (James aff., ¶ 10). But unless he thought the safes contained clothing purchased at Nordstrom, there is

no objective support for this claim.  James made no effort to describe what sort of fruits he was referring to, because he had no basis to do so.

Finally, the slapdash nature of the warrant application is underscored by James's reference to "<u>the</u> computer at the PREMISES [which] <u>is</u> also likely to be a storage device for evidence of the crime."  (James aff., ¶ 11) (emphasis added).  James refers to a single computer, even though at least five computers were identified by unique serial numbers in the affidavit and in "Attachment A."  (James aff., ¶ 6).  Apparently, no effort was made to tailor this boilerplate language to the actual facts of this particular case.  Even if it were true that one computer might contain evidence of the crime, there is nothing in the affidavit to support the claim that all five computers – including the three computers found in the children's bedrooms – probably contained evidence of the crime.  In short, the warrant is overbroad.

Defendant Claudia Francis requests an evidentiary hearing on her suppression motion, and further requests an opportunity to submit a post-hearing brief in this matter.

**POINT TWO**

**THE COURT SHOULD DIRECT THE GOVERNMENT TO MAKE EARLY DISCOVERY OF A WITNESS LIST, AN EXHIBIT LIST, WITNESS STATEMENTS AND IMPEACHMENT MATERIAL, AND RULE 404(b) EVIDENCE**

The government has provided a huge amount of discovery in this case.  Moreover, the more than 3,000 pages of documents consist of bank records, credit card records, nearly indecipherable Nordstrom records, and numerous blurry videotapes with no identifying information.

The government should have to do more than just bury the defendants in paper.  The defense cannot adequately prepare for trial unless the government produces, <u>at least thirty days</u>

before trial, a witness list, an exhibit list, witness statements and impeachment material, and a detailed description of any Rule 404(b) evidence it intends to offer. These items are all "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i).

Moreover, all of these requests are calculated to facilitate the orderly presentation of evidence and avoid unnecessary delays at trial.

A. Witness List

This Court clearly has the discretion to order the government to produce a witness list. United States v. Cannone, 528 F.2d 296, 299 (2d Cir. 1975). Some of the factors the courts have considered in determining whether to exercise this discretion are (i) whether the indictment charges only non-violent offenses and the defendant does not have a criminal record involving crimes of violence, (ii) whether the trial will largely involve testimony relating to documents, (iii) whether production of the witnesses' names will not likely lead to the witnesses' failure to appear at trial, and (iv) whether the indictment alleges offenses occurring over an extended period of time. United States v. Turkish, 458 F. Supp. 874, 881 (S.D.N.Y. 1978), aff'd, 623 F.2d 769 (2d Cir. 1980), cert. denied, 449 U.S. 1077 (1981); accord, United States v. Cannone, 528 F.2d at 300; United States v. Earls, 2004 WL 350725, at *9 (S.D.N.Y. 2004); United States v. Falkowitz, 214 F.Supp.2d 365, 395 (S.D.N.Y. 2002); United States v. Rueb, 2001 WL 96177, at *7 (S.D.N.Y. 2001).

All of these factors argue in favor of requiring a witness list here. Moreover, it would be no burden on the government to identify its witnesses before trial, and it would serve only to "level the playing field" in this case, not give some sort of improper advantage to the defense.

As in United States v. Falkowitz, supra, the Court should direct the government to

provide a witness list thirty days before trial.

B.  Exhibit List

Moreover, the Court can and should order the government to identify its trial exhibits well in advance of trial.  United States v. Earls, 2004 WL 350725 at *9; United States v. Falkowitz, 214 F.Supp.2d at 391;  United States v. Turkish, 458 F. Supp. at 881.  Thousands of pages of discovery have been produced or been made available for inspection.  Surely, the government does not intend to offer into evidence all of these documents.  To adequately prepare her defense, the defendant needs to know which of these thousands of documents the government actually intends to use.  The Court should direct the government to provide an exhibit list thirty days before trial, which identifies the exhibits by description and Bates-number (or, if there is no Bates-number, by some other identifying characteristic).  A proviso that if the government shows good cause at trial why a particular exhibit was left off the list it will not be precluded on that basis from offering the exhibit in evidence, is certainly appropriate.

C.  Witness Statements and Impeachment Material

As to witness statements and impeachment material (Jencks, 18 U.S.C. § 3500, Giglio), we recognize that the Court cannot compel the government to make production of Jencks/3500 material prior to trial.  However, the Court does have "the authority to determine, as a matter of sound case management, when the Government shall disclose Brady and Giglio material." United States v. Morales, 280 F.Supp.2d 263, 275 (S.D.N.Y. 2002); accord, United States v. Madrid, 302 F.Supp.2d 187, 193 (S.D.N.Y. 2003).  Typically, Giglio material is inextricably intertwined with Jencks/3500 material.  Here, particularly since we expect the Giglio and 3500 material to be extensive and voluminous – the indictment refers to numerous individual alleged

-13-

victims – fairness and due process dictate that Claudia Francis have access to such material at least thirty days in advance of trial. There is no possible threat to the government's witnesses. Again, the defendant is merely seeking to level the playing field so that she can defend herself against these serious charges.

Moreover, under Rule 611(a) the Federal Rules of Evidence, the Court has wide discretion over the mode and order of proof at trial. This is relevant here because in the event the defendant has insufficient time to read, digest, and follow-up on the Jencks and Giglio material for particular witnesses prior to their testimony at trial, the Court would have the authority to delay cross-examination of these witnesses, or direct that they be re-called at a later date.

Under the circumstances of this case, if witness statements and impeachment material are not provided thirty days before trial, we will not, at least with respect to some of the witnesses, have sufficient time to read, digest, and follow-up on the material before cross-examining those witnesses. In that event, Ms. Francis will move pursuant to Rule 611 either to continue the testimony of government witnesses or to re-call them. If, on the other hand, the witness statements and impeachment material are provided thirty days before trial, we represent that we will not make any such application based on insufficient time to study this material.

D.  Rule 404(b) Evidence

As to Rule 404(b) (similar act) evidence, the government is required to "provide reasonable notice in advance of trial . . . of the general nature of any such evidence it intends to introduce at trial." That notice period should be at least thirty days. United States v. Reddy, 190 F.Supp.2d 558, 576-77 (S.D.N.Y. 2002) (government conceded that thirty days notice was

reasonable; court ordered forty-five days notice); United States v. Nachamie, 91 F.Supp.2d 565, 577 (S.D.N.Y. 2000) (one month notice ordered).

## POINT THREE

### THE COURT SHOULD DIRECT THE GOVERNMENT TO PROVIDE A BILL OF PARTICULARS

Other than a list of overt acts attributed to each of the alleged co-conspirators, this "bare bones" indictment is remarkably devoid of any factual particulars or narrative. There is no description of how the conspiracy or scheme operated, or how the alleged co-conspirators are connected to one another. The indictment does little more than quote the language of the statute. In short, there are no allegations about means or methods which are typically included in such indictments.

In this Circuit, the government must provide a bill of particulars when the indictment fails "to identify with sufficient particularity the nature of the charge pending against [defendant], thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). Providing a mass of documents from which a defendant must ferret out the necessary particulars – which is what the government did here – does not satisfy the government's obligation to particularize the offense charged. Indeed, it merely underscores the need for particulars. Id. at 574-75. This indictment does not outline the alleged credit card scheme at all, and is so non-specific that it does not "advise a defendant of the specific acts of which [she] is accused." United States v. Torres, 901 F.2d 205, 234 (2d Cir.), cert. denied, 498 U.S. 906 (1990). In light of that failure, the Court should require the government to "identify . . . the 'means and methods' employed by the [conspiracy] not specified

-15-

in the indictment." United States v. Lino, 2001 WL 8356, at *5 (S.D.N.Y. 2000).

Accordingly, with respect to Counts One and Two of the indictment, Claudia Francis requests that the Court direct the government to provide a bill of particulars as set forth below:

1. Describe the means and methods of the alleged conspiracy.

2. Describe how the alleged credit card fraud scheme was devised, and how it functioned.

3. Describe how the unauthorized credit cards or credit card information was obtained.

4. Describe the roles of each of the co-conspirators, especially the role of Claudia Francis.

5. Identify who made the unauthorized purchases of the goods later returned for credit, and when and where those purchases were made.

6. Explain how the proceeds of the alleged scheme were divided among the alleged co-conspirators.  (Briccetti aff., ¶ ___).

## CONCLUSION

For all the foregoing reasons, the Court (1) should conduct an evidentiary hearing on Claudia Francis's motion to suppress, and should exclude from the trial the evidence seized from Claudia Francis's home, (2) direct the government to make early disclosure of a witness list; an exhibit list; witness statements and impeachment material; and Rule 404(b) evidence; and (3) direct the government to provide a bill of particulars as requested above.

In addition, defendant Claudia Francis joins in the motions of her co-defendants to the extent such motions are applicable to her.

Dated: White Plains, NY
February 1, 2008

          BRICCETTI, CALHOUN & LAWRENCE, LLP

By:   <u>s/ Vincent L. Briccetti</u>
       Vincent L. Briccetti
       81 Main Street, Suite 450
       White Plains, NY 10601
       (914) 946-5900

       ATTORNEYS FOR DEFENDANT
       CLAUDIA FRANCIS